The next case for argument is 23-1877, Marmen Inc. v. United States. Good morning. May it please the Court, I will start with the minor correction to Marmen to accept a minor correction to the cost reconciliation is unsupported by substantial evidence. Now, Marmen is a Canadian company. Its financial statements are expressed in Canadian dollars and it reported its production costs to Commerce in Canadian dollars. So, in reconciling the company's audited cost of goods sold to its reported costs, it's necessary that all the adjustments in between must also be expressed in Canadian dollars. However, inadvertently, in preparing its Excel spreadsheet reconciliation, Marmen failed to ensure that one value, one line, was entirely expressed in Canadian dollars. So, Marmen submitted a corrected cost reconciliation together with support and Commerce unreasonably rejected the correction. First, Commerce reasoned that the exchange rate correction that Marmen sought to make was already accounted for in the audited cost of goods sold, the starting position for the reconciliation, and in the reported cost, the ending point. But this is totally illogical. We, of course, agree that the cost of goods sold and the reported costs were correctly expressed in Canadian dollars. But the point is, for the reconciliation to work, all the adjustments in between also need to be expressed in Canadian dollars. One of them wasn't. It was just one line of an Excel spreadsheet that Marmen prepared and there's absolutely no double counting. I realize this may seem like the flea on the tail of the dog, but one of the points Commerce makes, at least here, is that you relied on a one-year average for the exchange rate that was incorrect or unsupported. Suppose we agreed with you on everything else. Why would that not be enough to reject this point? Commerce's finding with respect to the exchange rate is particularly unreasonable. I know you say they have these things on their website, but so? Well, what that means is that Marmen reported and used in its correction the exchange rate that it used in the normal course of business during the period of investigation in its cost system as reported on the record. And a different exchange rate for each of the invoice sales or use the same exchange rate for the group during – this is a six-month period, right, in which you mistakenly used U.S. dollars where you should have Canadian. What was the – yeah, did you use just a single exchange rate when you submitted the L1 correction? And even though there were different sales during that period? Right. Well, in Marmen's accounting system, the issue was that in 2018, whereas its accounting system left U.S. dollar purchases unconverted, in 2019, its accounting system would automatically convert U.S. dollar purchases to Canadian dollars using a fixed rate of exchange. Fixed for what period? The date? For the entire year 2019. But in making this correction, this was in Marmen's accounting system. But in making the correction, what Marmen did was it used the actual exchange rate used in its – that it used in its cost reporting system, and which is almost identical to the exchange rate that its accounting system would automatically make in 2019. Marmen used the same exchange rate for the 2018 purchases. And we're talking about an exchange rate. To reject the correction simply because Commerce says that an exchange rate is unsupported is completely unreasonable. Can I just insert one more question? This is a smaller flea on the tail of the dog than Judge Torontos was. But I know we can't talk about the numbers here, but the amici spend quite a bit of time arguing what rate this period is for. Can you tell us, is this for all of 2018? All of a period of interest, or just the second half of 2018? The exchange rate that Marmen used in the correction was for the entire year 2018. But nevertheless, Commerce, again, could look on its website and corroborate that it's an accurate exchange rate. The real issue isn't the exchange rate. It's just that one line of the spreadsheet of the reconciliation is – So are you saying that Commerce, instead of using the exchange rate you proposed, should have unilaterally gone to its website and figured out what the correct exchange rate should have been? No, Your Honor, I'm not arguing that. What I'm saying is that it's unreasonable to reject an exchange rate on the ground that it's unsupported when the administering agency maintains daily exchange rates for anti-dumping calculation purposes and could easily check to make sure that it's comfortable that the exchange rate we used and reported is accurate. And there's some small disparity, difference in the numbers. Is that a rounding up issue? Is that just a rounding? A small difference in the exchange rates?  There's a small difference in the exchange rate that Marmen's accounting system automatically used in 2019 to convert U.S. dollar purchases to Canadian dollar purchases and the actual exchange rate that Marmen incurred during 2018. There is a small discrepancy there, but it's very small, and it pales in comparison to the discrepancy that the error created by virtue of the fact that Marmen inadvertently failed to ensure that one line in a cost reconciliation spreadsheet was entirely expressed in Canadian dollars. And accuracy should be Commerce's primary concern. Yeah, but they depend on you for information. And do I remember right? The period of investigation is basically mid-2018 to mid-2019, right? And you changed your internal accounting system as of January 1st, so from the second half of that period, all the conversions were made uncontested, apparently. The problem was that the conversions were not made for the first half of the period of investigation, which fell within calendar year 2018. And so you needed an exchange rate or multiple exchange rates for the various sales that were made during that period. I'm sorry, this is purchases by you from your subsidiary or affiliate. Correct. We're talking about one line in the spreadsheet for Marmen Inc.'s purchases of wind tower sections from its affiliate. All of those sales were denominated in U.S. dollars. And for the second half of 2018, those six months, simply in that reconciliation worksheet, Marmen failed to ensure that he just took the number from his accounting system, which was the purchase value for those six months, which was in U.S. dollars. Right, but now we're just talking about this seemingly small but maybe consequential issue at the end, that when you said convert by, you know, one point, whatever it is, that they said, why should we use that number? Well, what's your justification for using that number? And they now, at least here, say that unjustified choice alone was enough for them to reject the L1 change. Right, Your Honor, that is Commerce's explanation. And our argument is that that was completely unreasonable because we're not talking about an error in reported costs. We're talking about an error in an exchange rate that can easily be validated by Commerce itself. And in addition to the exchange rate, Marmen submitted, for the record, a schedule of all the invoices at issue, the U.S. dollar and all of which, and that schedule clearly showed that the purchases in 2018 were not properly converted to Canadian dollars. They were left in U.S. dollars. We explained that schedule of invoices at page 48 of Marmen's appellant's brief, and the appellees, it's unassailable, what it demonstrates, and the appellees failed Your Honors, if I may, I think I need to move on to the Cohen's d argument. Commerce's reliance on the Cohen's d coefficient and its consequent calculation of Marmen's dumping margin, using the average transaction calculation method, cannot be sustained. In step, this court recognized... Can I ask, just because time is short, so I don't want to... Yeah. If we agree with you, what's the next step? And I'll ask this of the government as well. I mean, is there a way... Is everybody assured there's another way to do this? There's... Or is there... There's no... I don't know. What do you envision the next step? If we were to say the same thing we said in stub and the same thing we've said before, and not satisfied that commerce has given us a sufficient basis for being okay with that, then what happens? There should be no next step for commerce. There should be no remand for commerce to correct this. Commerce has been given a chance, and commerce is not using the Cohen's d coefficient accurately. Therefore, commerce's decision that there was a pattern of significant price differences is... cannot be sustained. It's not reasonable. It cannot be sustained. Commerce should not be given a second chance. It should recalculate Marmen's dumping margin using the standard average-to-average transaction comparison method. Can I ask a... I don't remember this. I should. But when commerce did Cohen's d here, did it, in the denominator, use a weighted average of the two different variances or standard deviations? Doesn't matter. Commerce used... Its normal practice is to use a simple average of the standard deviations for the two different data sets. Okay, but you haven't separately challenged that. That was the issue in MidContinent. Correct. But it also... But it recognized that there were two... that the standard deviations were distinct between the control group and the test group. Right, right. That's the MidContinent case. And then it averaged. Our main argument here is that commerce's... Do you happen to know where that is, where they said we're doing sigma prime and not sigma? Sure. In commerce's... both its preliminary decision memo and its final decision... Only J.A. numbers count in answer to a question. That's okay. Don't worry about it. I don't have it at the moment, Your Honor. I apologize. Our main argument is that commerce's excuse or justification for not ensuring that the assumptions underlying the Cohen's d coefficient are satisfied is wrong. Commerce's claim is that if it's calculated... When it uses the Cohen's d coefficient, it is comparing data sets that consist of complete populations, complete populations of the U.S. sales. And commerce claims that under this circumstance, when you compare the data sets or populations as opposed to samples, the Cohen's d assumptions no longer apply. But this is completely wrong. Professor Cohen himself, in explaining the importance of the assumptions, did so in the context of comparing populations. And you can see this in Appendix 4736. In addition, Professor Cohen calculated the small, medium, and large thresholds in relation... All in the context of comparing data sets that are populations and also while ensuring that the three assumptions are satisfied. And you can see this at Appendix 4739 through page 4742. The Cohen's d coefficient itself that Professor Cohen calculated and his thresholds for small, medium, and large are tied to percentages of non-overlap. And it's these percentages of non-overlap that give the Cohen's d coefficient and the small, medium, and large thresholds meaning in the first place. However, if any of the assumptions, normal distribution, equivalent variances, equal size, if any of those assumptions is violated, then the Cohen's d coefficient will not correspond to the same percentages of non-overlap that relate to the small, medium, and large cutoffs. And then the d coefficient is essentially meaningless. Do you happen to know the data in this case, how close to normal distribution the various curves are or whether the variance is more or less the same, maybe not identical? And then also whether the size of the various populations is... Yes, Your Honor. In fact, during the remand proceeding, we submitted a demonstration that the three assumptions, and in particular, the assumptions of normal distributions and equivalent variances were not satisfied. We did so at Appendix 3987 through 4663, but Commerce rejected that submission. There's something in Cohen itself that suggests, okay, maybe you don't need equal variance. You can have some variance in the variance, but therefore, that's where you go to sigma prime. Your Honor, I believe you're referring to, and this is something the government pointed out, equation 2.3.2. But there, and you're correct, in that scenario, Professor Cohen did say that the requirement of equivalent standard deviations could be relaxed somewhat. But he also articulated that only moderate departures from the three assumptions could be tolerated. And he stated that, he indicated, it's at Appendix 4734 through 4735, that if... I guess what I'm trying to get at, as I think you can tell based on your response, is that maybe you don't need the assumptions to be perfectly satisfied, that maybe it's now an in-the-wheats factual dispute over what degree of dissimilarity you can have with respect to normal distribution, equal variance, and size. Your Honor, in the one scenario that you're referring to, equation 2.3.2, again, Professor Cohen did indicate that there could be a modest departure, but the overall point is the same, which is that the assumptions do matter, they are important, they cannot be completely disregarded. In fact, in that very example... Let me just say, I guess this is a different formulation of what I think is the same question. With the rejection of your submission about your data, which I do not see was appealed, how have you established prejudice from what I will assume for purposes of this question was an erroneous reliance on the point date figure of Cohen's date? Well, if I understand the question, Your Honor, I mean, our argument is... It relates to what Judge Chen said, right? I mean, sometimes it might be, you know, small, I want to say variation, I don't mean variance, small variation from the assumptions of same variance between the two groups won't make a big difference in deciding whether the 0.8 threshold figure, which is I think what all of this is about, has practical significance for identifying a real-world practical significant difference between the prices in the two groups, which is what we're talking about. But if you haven't established why your numbers would produce a different analysis, how have you shown prejudice from the erroneous assumption reliance on Cohen's date figure? Well, Your Honor, we made a submission that was unreasonably rejected, but beyond that, it's really commerce's responsibility to ensure that if it's going to rely on a Cohen's date coefficient to find a pattern of significant price differences, it has to use the Cohen's date coefficient correctly. So commerce has the data. It has the U.S. sales data. It can test whether the three assumptions are satisfied, and commerce's failure to do here, so here, is impermissible and it cannot be sustained. Your Honors, we are talking about price differences of less than 1%, and commerce claimed, based on blind reliance on the Cohen's date coefficient, that those price differences are large, equivalent in Professor Cohen's words to the difference in IQ between a college graduate and a student with a 50-50 chance of passing high school. Objectively, no reasonable person would agree that price differences of less than 1% are on par with that, that difference in IQ between a college graduate and a student who has only a 50-50 chance of passing high school. So, Your Honor, it's commerce's error here. Commerce cannot rely on a Cohen's date coefficient without ensuring that it's using it correctly, and the way commerce uses the Cohen's date coefficient without adherence to any of the assumptions that make it meaningful is completely impermissible. No, no, no, I don't mean go away. I think that's all my time, Your Honors, unless you have other questions. All right, we'll hear from the government. Thank you. Good afternoon, Your Honors, and may it please the Court, I will pick up where my colleague left off in the discussion of the Cohen's d issue. I think the first important point to make here is that in the multiple cases that have addressed this issue, the Cohen's d coefficient is only one part of commerce's differential pricing. Right, but you have not even come close to establishing that if this first step, which is a filtering step, is unsupported, the rest makes up for it. I just don't see how commerce has established anything like that. The first step of figuring out the d and segregating by 0.8 bigger or less, and then going on to the next steps, which have a 0.33 and all that stuff. I don't see how commerce has established that even if we're completely wrong in using the 0.8 to do the filtering, the rest will cure all the problems of making this into a real-world practical test. Well, I think, Your Honor, the issue there is that the appellants have tried to say that the Cohen's d coefficient is what commerce is using to establish the pattern that the statutory language calls for. And the point that I'm making is it's only one piece of that. That's true. So the issues that have been brought up here about some hypotheticals that have been raised about what happens if the variances are different and how does that affect the ultimate coefficient and where does that go? Again, you have to run the process through to the end, completing those other steps of the differential pricing analysis before commerce would make the determination that they're meaningful. For example, it was raised towards the end of the appellants' briefing, although the hypothetical that came from the Stuck case had to do with the situation where what happens if you have a test and control group that have very small variances, right? And once you step through the math, what you wind up with is a coefficient, a Cohen's d coefficient that's very, very high, right? The dollar differences are trivial. Exactly, right. So, okay, even if you have that, you still have to walk through the rest of the process. Okay, in that situation, you're going to have most of the sales, if not all, pass the Cohen's d test. We look at the ratio test, right, which has already been affirmed by this court as acceptable. Does it pass that 33% threshold or 66% threshold, assuming that it does, right? Because, again, you walk through the math. You've got a lot of these passes. You still have that meaningful difference test. So commerce is still going to take a step back and look at these two groups and say, okay, is this difference meaningful? Is the A to A method de minimis and A to T is not? Or if neither method is de minimis, is there bigger than a 25% difference? You still have to go through that step. And what's the standard for determining whether the difference discovered is meaningful? In that final step of the differential pricing analysis, the meaningful difference, commerce will actually run both the A to A test on the sales and also run the A to T test on the sales. And the standard is... That's not a meaningful difference between the test and control group. That's just a meaningful difference between the two methodologies that they're choosing from. Right, but that's how they're determining whether or not a meaningful difference exists, right? They're looking at running the methodology on one and looking at what... If we can find some kind of violation, some kind of dumping with one method and not the other, and those methods turn out differently, non-trivially, then we'll do it. But that doesn't tell you whether, for example, the stub hypothetical about trivial dollar differences... Right. Well, this kind of brings us back, I think, to the Cohen's d coefficient, right? Because all that the Cohen's d coefficient is attempting to do is tell us, mathematically, are these two groups different? Is the difference between these two groups practically significant is the language that Professor Cohen uses. So the language of the statute says that commerce will use this A to A method unless it can't account for these instances of what's been termed mask dumping. So they need a process, a methodology, to determine whether or not, when they're looking at these different regions, time periods, whatever, whether or not any differences that they see in what becomes the test and control group are, in fact, significant. And that's what they're using the Cohen's d coefficient to do. So let me, I guess, describe two different things, one of which I think commerce did say, and one of which perhaps commerce could say. The thing that I think commerce did say is we're going to use the Cohen's d to tell us, at the threshold, whether there's a practically significant difference in the relevant outcome between the two groups. Even though Cohen... Actually, because Cohen was about populations and not samples, which I think is just wrong. That's one thing. Another thing it could say is we recognize that Cohen said that he's getting the 0.8 as a threshold from consideration of normal distributions with maybe, say, equal variances or roughly equal variances. And importantly, same numbers of units in the two groups unless you do weighted averaging, which is not at issue here but was in mid-continent. And commerce also did something unjustified, we thought, on that. But if commerce said we recognize the limits of what Cohen did for practical significance, he was considering one kind of distribution. But the general idea, and now we're going to do our own statistical analysis, methodological, statistical explanation for why different distributions can be treated somewhat alike. And I don't see that second explanation at all. All I see is we rely on Cohen, Cohen's greatly authoritative, and so we don't have to think anymore. And those are two very different things. That's what's, I guess, troubling me. I understand, John. I think that what commerce has said here is they are – I take your point about the explanation and how they phrased it. I think that what – This is not a one-time thing, right? This is an ongoing methodological choice and seemingly a not quite – maybe even carbon copy defense of what they're doing. To a certain extent, yes, I would agree with that. I think that effectively it's – commerce is using the Cohen's d coefficient for a particular purpose. They're taking this part of Cohen's analysis and saying that the equation will produce a coefficient that will show this. Now, the objection to that that's been raised is that, well, Cohen made all these assumptions, these equal variances and everything else that comes in there. And, again, the response is, and I think this is kind of where maybe inartful in some way, but what commerce is essentially saying is we're using Cohen as the way that we're making this mathematical determination. So we're applying Cohen in this specific way. They're not using Cohen to conduct a comparison of sample groups. They're using it to compare entire populations of sales data, which they have. What in Cohen or any other literature tells us that when it comes to using whole populations as opposed to samples, you can throw away the assumptions? That seems to be the message and theme of commerce's position. And, you know, I looked at the sites in your brief. I looked at whatever sites commerce's redetermination referenced, and I didn't see anything that remotely suggests that only when it comes to sampling do you need these assumptions to be in effect. But, hey, it's important to understand that if you've got all the population data, you're good to go. Throw away the assumptions. Where is that in Cohen or in any other publication or, you know, expert testimony? I didn't see it. I can't pull a precise pull quote that says you may throw away the assumptions if, right? The best evidence they have for their personal theory on how to think about when you can and cannot comply with the assumptions. Two things jump to mind. First and foremost is Cohen's discussion itself, right? Where? I mean, it's in the appendix, the discussion in his paper, Section 2.2 to 2.3, where he's walking through all of this. The reason he's going through all of these discussions about the assumptions and the sampling, and, you know, there's this discussion of the t-tests and all these different factors, is because he's trying to ensure that the samples being compared are reliable representations of the populations that they're intended to represent. And there's also— Where can I find a passage that tells me this is all sample-sensitive, that we need these assumptions? I know, you know, we can sit here and talk in generalities about what different competing and takeaway interpretations of Cohen might be, but where is there text I can look at that can give me some reasonable sense that Congress was on to something when it said, whole population data, forget about the assumptions? Right, so there is a—well, there's a quote from Dr. Ellis's paper, if the quote will bear with me. Of course, I didn't put down the appendix citation. But we reference, you know, Dr. Ellis's paper talking about Dr. Cohen's analysis, where he says that, of course, the idea when making these comparisons would be if you had the entire population, right? But even in the examples that turn up in Cohen and have been mentioned here today, you know, he's talking about, you know, the heights of young women and girls or the IQs within a population. They're referencing a population, okay, even if it's of, you know, this country, that's millions, tens of millions of people. But let me just see if I—I mean, this is, I guess, how I've been thinking about it. Dr. Cohen, he's a psychologist. You can't basically take measurements, you know, IQ, if that's what it was, on every, you know, 13- and 19-year-old girl in the country. Most psychological experiments, the pool, the groups that you are going to use in doing a comparison will be samples. Ideally, he says, of course, we'd have full populations. But the point of his whole—Cohen's D—is once you have groups, we're going to try to figure out if those groups differ significantly. It doesn't matter where you came—where you got the groups from. It does matter whether when you decide there's a significant difference between the groups, which is what Cohen's D is about, whether you draw an inference about a whole population. But that's a later question. The D thing is about whether there is a difference, they call it effect size, the effect of being in group one versus group two, no matter how those groups came about. Right, and I think the first part of your statement is actually the answer to Judge Chen's question, which is that he's going through all of this text, all of this discussion about these different assumptions to ensure that his samples are accurate, are reliable. But when you have a population, reliability is not an issue. We're not afraid that the sample group is going to misrepresent the population because we have the entire population. And I think the reason why you don't have that statement, that clean pull quote, to say you can toss this out is that in most of the situations where they're making these comparisons, it's totally impractical to pull an entire population. But that's not the case here, nor does that make Commerce's use of the equation and the resulting thresholds invalid. But you would agree with me that there's nothing in Cohen or any other literature that says these assumptions are needed because we're sampling them. I mean, again... There isn't. I think Cohen does say that they're needed because they're sampling. That's his entire discussion about all of those assumptions. That's what I'm looking for. If there was something in Cohen that said these assumptions are important because we're sampling. We don't have the full population. I apologize. I don't have the appendix cited here. The pages in Cohen's paper, which I'm confident are in the record, it runs after the introduction, which is the first few pages. The first few pages, 2021? No, it runs from about page 7 through, I think, about page 40, which is where he starts to get into the various equations and so forth that we've been talking about. But again, when he starts with his base equation and then goes into all of these other discussions, the entire point of those discussions is to ensure the reliability of the sample, right? And so, again, that's why, as this has come up in all of these cases, Commerce is saying that that reliability is not an issue. I see my time has expired. If the Court has no further questions... Do you happen to remember what... I have the Ellis thing. It's at 4805 in the appendix. What was it in... You referred to Ellis earlier. Yes, so we noted in our briefing, we have a citation to... Page 64 of your brief? Yes. Oh, that just says, right, you often can't get full populations. It's so wet, that's the point. I think it kind of goes to the premise of your earlier question, Your Honor, which is that once we have the samples, right, Cohen is doing all of this work to get to a place where he has samples that are reliable representations of their populations. But he's not doing the comparison measure based on how the groups came about. I'm sorry, I'm not... I don't think I'm following. Whether you have the entire population of, you know, teenage girls in the country and you're actually measuring them and you're doing by age group, the 13s and the 19s or whatever, I wouldn't... The numbers were something ages, right? Or whether you have a sample of 10,000 of them and you're doing 13 versus 19. The sampling process will be meaningful. That is a process you went through in sampling and what the distribution is like of the relevant variable that you're trying to measure will be important for whether at the very end of the day, what you discover about the difference between a 13, 8-year-old group and a 19-year-old group, whether that difference, which is that you have just two groups, the two cases you have out of a population of 10,000, another out of a population of, I don't know, 30 million or something, and the entire population. You're figuring out the difference in those two groups. When it's the 10,000, you want to draw an inference about the whole population.  And it matters what the distribution is for whether the sample was good enough. The comparison between the two groups doesn't care one whit about... Once you have the two groups, either out of the 10,000 or out of the 30 million, you're just trying to figure out if those two groups look practically significant in the relevant variable. Yes, that's correct. So that has nothing to do with sampling versus total population. That's correct. Okay. Okay. Thank you.  May it please the Court. I'll be brief. I'll take up with Cohen's due, but I won't belabor it too much. I'm not sure that I have all that much to add at this juncture. But one thing that I think might have gotten a little bit lost in all of this is why is Congress even doing this? Why do we care? And it's because there is this statutory requirement, or at least Congress has said, Congress, you can use, you may use this alternative calculation methodology if the following conditions are met. So Commerce reasonably has said, well, let's figure out some relatively predictable way of figuring out whether the conditions are met. And it really is as Commerce has adapted it, and I do not doubt. Commerce is not using Cohen's due in the sense that Cohen developed it for. Commerce is not a social scientist trying to design experiments and figure out in advance what sample size or population size would I need to get this kind of effect size. They're not doing that. But they've said we have a completely different kind of thing we need to do. It's got some analogous concepts to it. And we want to refine our old NAILS test, which basically used standard deviations and averages to make this kind of assessment of whether a response to sale prices differed across time, customer, or region. To me, Cohen's D is just the same kind of test that Commerce already had. It's perhaps a refinement, but that general. But it has this very precise 0.8 figure that Commerce has. Well, is it very precise? It's an extremely specific number. Yes, but so is 25%. So is 33%. That's a specific number. But what if we disagree with Commerce's point of view or find it unreasonable to say that Cohen's D formula, you don't need the assumptions when you have whole population data? I think even if you think, well, Commerce, you're just not using Cohen's D the way Cohen meant it. The way they want it to be understood. Well, you're not using it in the context Cohen meant it to be used, and you're not using it under the assumptions that Cohen describes with the use that he described. But this sort of general method of analyzing price differences using standard deviations and averages is not somehow unique to Cohen's D. The NAILS test had a somewhat similar use of averages and standard deviations. It just didn't trace itself to particular statistical literature. And in this way, I think you can understand Commerce's adaptation and use of Cohen's D as similar to the rules of thumb this court has already approved that Commerce use for the ratio test or the meaningful difference test. Why did Commerce choose 25% as the difference? They could have said 50, 33, 10, anything. Well, everything you're saying is maybe something Commerce could say on remand. Because this is not the words that they used this time around. To Judge Prost's point, then, what's next? I don't think what's next as the appellant would have it is just for this court to say, you know, three strikes and you're out, Commerce. You don't get to make these types of decisions. Recalculate margin the way Marmon wants it. Instead, it's go back. Maybe they have to go back to the drawing board, but that's what would happen. It's go back to the drawing board. Maybe readapt the NAILS test. Maybe explain better. Maybe do what you said, Judge Taranto, and say, okay, we're not really doing Cohen's D, but here's why our use of this similar or identical... The statistical literature that's been presented to us, some of it in the record, some of it not, acknowledge that, of course, when you're trying to figure out a effect size, there are a bunch of different statistical... I don't mean tools, but when you're doing a statistical analysis, there's no single test. I don't mean that you go to the grocery store and there's a choice. This is all math, and the fact that Cohen came up with a particular way that's really quite remarkably simple and has certain virtues doesn't mean that there aren't variations on it that could be applied, but they have to be established. I think some of the articles use a much more sophisticated form of effect size measurement, but commerce hasn't done the work to do that, to say, with prices, we don't know anything about the distribution because these are not kind of natural things. They're humans making choices for all kinds of reasons, and here's a way that gets at the thing, but not simply by saying, Dr. Cohen did this, we claim his authority, and we're going to do it too. I'm not sure commerce... Commerce obviously is looking to Dr. Cohen, and they're, I think, attempting to come up with a way of doing this that isn't necessarily the agency, just from first principles, attempting to reason something. They are adapting and adopting something. They're not using Dr. Cohen's coefficient. Is that what they did here? Are you suggesting that's what happened here? Yes, I'm saying the way they have used... They're obviously not designing experiments. They're not designing social experiments, which is the context in which Dr. Cohen developed his coefficient, but they're trying to come up with... They're trying to adapt from him. What are rules of thumb for determining this first step of our analysis, just as they've established rules of thumb, like 33% and 66% or a 25% difference with the other portions of the test, and those have been upheld as reasonable exercises of commerce's discretion. I see I'm out of time, so unless the panel has further questions, I'll retire. What about the currency exchange? Oh, the currency exchange. I thought we had forgotten all about that in our currency... No, we didn't. Okay. This side of the bench is going to have to... Okay, all right, well, yes, I know. So the other side pointed out in their briefing, look, we know what the rate, exchange rate was. If you multiply it by a certain number, it gets you to another number, and that other number kind of neatly fits what really should have been the number. That's what they say. I don't know that we know what the right exchange rate was, because as commerce observed, you use this exchange rate in your calculation, but we don't know where it came from. You haven't documented the origin of this exchange rate. It, in fact, differs from exchange rates used elsewhere, also appears to be not entirely relevant to the time period. And they go so far, as Judge Toronto pointed out, to say, well, okay, maybe we didn't really document this, but you should have taken independent steps to verify its accuracy using your own information that was at your disposal. That's an argument that's both waived and unexhausted, and for that matter, Marmon's auditors don't appear to have used this rate in their own conversions, which you can look at Appendix 3602 and Appendix 4679. That's not me attempting to back anything out. That's Marmon itself saying what exchange rate its auditor used in converting certain figures from its financial statements. And beyond that, you know, when they're saying we need to make this adjustment, to me it's very telling that they want Commerce to make an adjustment that would entirely offset their auditor's own adjustments to their audited financial statements as part of the reconciliation. Let me just see if I understand it. This is my understanding of their point. There's nothing strange about that at all, because the mistake was not the auditors. The mistake was their lawyers or whoever filed that first filing in taking from the wrong place a U.S. dollar figure for these things. So all they're trying to do is to correct their own mistake, the they here being not the auditor. Yes, that is their argument, that this mistake is their own and has nothing to do with the auditors, but that is not, they at most have come up with their own potentially plausible reading of the record that does not mean it supplants Commerce's reasonable view of the record under the substantial evidence standard, and that's what they would have to achieve here in order to prevail. They haven't established that, as Commerce has explained in its remand redetermination and is further supported by the fact that the exchange rate they used in this calculation seems to not be documented and is contradicted by other evidence in the record as to what would have been potentially exchange rates applicable to the correct period. Thank you. We'll restore five minutes if you need it. I'm sorry, Your Honor, how much? Five minutes or three minutes? Okay, thank you very much. First, I'd like to say...  Thank you. First... Apologies. There was one issue I did not get to out of the interest in time that has to do with averaging Marmon's reported product-specific play costs. I will just say that we're resting on the briefs. Yes. That's all I'd like to add. It's fine. Regarding the minor correction to the cost reconciliation, just in brief, Commerce's reading of the record is not reasonable. That's why it can't be sustained as supported by substantial evidence. None of Commerce's conclusions are reasonable, and in particular with respect to the exchange rate, it is egregious, outrageous to reject a correction on the grounds that Marmon failed to support an exchange rate when exchange rates are objective things that can be measured, and in fact Commerce measures and records exchange rates on its website daily for purposes of anti-dumping margin calculations. Turning to Collins D. Just real quick, is it true that your reconciliation worksheet had entries in other places in the worksheet that included auditor adjustments, and yet for some strange reason for item L, in your view, it failed to do that? The auditor's adjustment refers to the Marmon's former accounting practice in 2018 when it did not convert U.S. dollar purchases to Canadian dollars in its system. So what happened... I'm just trying to find out if the worksheet, the reconciliation worksheet itself that you turned in, is it not true that there are entries in that worksheet that reflect the auditor adjustments, but in your view, for some reason, whatever reason, you went out of your way to make a mistake with respect to item L and not also apply the auditor-related adjustments there? Yes, I apologize, Your Honor. I was just trying to build up to your question, the answer to your question. I'll get there quicker. The items you're referring to are items P, Q, and R in the cost reconciliation, Excel lines 41, 42, and 43. Those do relate to the auditor's year-end adjustment at the end of the year to make sure that all values in Marmon's audited financial statements are expressed entirely in Canadian dollars. However, as we stated clearly on the record, this correction to one line of cost reconciliation worksheet had nothing to do with the auditor's adjustment at year-end. It was simply an inadvertent error by Marmon, taking the purchase value from 2018 and forgetting that, oh, we have to convert this purchase value to U.S. dollars. That's all it is. It's totally separate from the auditor's. Was it the auditor's adjustment on P, Q, and R for the purpose of the AD investigation submission or for internal business purposes? It's just the normal independent auditing process having nothing to do with- That's part of his audit. Yes. But as part of that audit, it did this currency exchange rate that corresponds to the item L. But for whatever reason- Item L is- Your side did not take that from the auditor adjustment and apply that to item L, even though it applied other auditor adjustments from that same year to other items. Is that a fair understanding of what happened here? Not entirely, Your Honor. The auditor's adjustment is one global exchange rate calculation or conversion made at the end of the year for purposes of the audit financial statements. All that happened here, and it's really understandable, is that in preparing this cost reconciliation worksheet, when Marmon- It has to deduct Marmon, Inc.'s purchases of wind tower sections from Marmon Energy. And in taking that value of the deduction, Marmon went straight to its accounting system, which in 2018 left that purchase value unconverted, left it in U.S. dollars. That's all that happened. At the year end, yes, the auditor would take all purchases, all transactions conducted in foreign currencies and convert them to Canadian dollars, including Marmon, Inc.'s purchases of wind tower sections from Marmon Energy. However, this was Marmon's inadvertent independent error just preparing a cost reconciliation worksheet. It went to its accounting system and not to the auditor's calculations for that one line. Cohen's d, what can I say? I don't have much time. But I will say that Commerce uses it wrong. The Cohen's d coefficient does not have some- and the .8 threshold for large does not have some independent meaning. It only has meaning in relation to percentages of non-overlap. And those percentages that Professor Cohen defined will not reach the same percentages if the three assumptions are not satisfied. And the Michi Curie did a very good job of explaining this clearly at pages 17 to 19 of their brief. So I'd recommend, ask the court to please review that. Thank you very much. Thank you. We thank both sides for the cases submitted.